IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL CASE NO. 3:22-cv-00408-MR

| | |
|---|---|
| **HENRY LEE CLYBURN,** )<br>)<br>Petitioner, )<br>)<br>)<br>vs. )<br>)<br>)<br>)<br>**LESLIE COOLEY DISMUKES,** )<br>Secretary, North Carolina )<br>Department of Adult Correction, )<br>)<br>Respondent. )<br>_____ ) | **MEMORANDUM OF<br>DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Petition for Writ of Habeas Corpus filed by the Petitioner pursuant to 28 U.S.C. § 2254. [Doc. 1].

I.   PROCEDURAL BACKGROUND

Henry Lee Clyburn (the "Petitioner") is a former prisoner of the State of North Carolina, currently serving terms of post-release supervision.[1]

---

[1] See https://webapps.doc. state.nc.us/opi/viewoffender.do?method=view&offenderID=0 80952&searchOffenderId=0780952&searchDOBRange=0&listurl=pagelistoffendersearc hresults&listpage=1 (last accessed Aug. 15, 2025); Fed. R. Evid. 201.  Petitioner's case did not become moot upon his release from custody because he then began his terms of post-release supervision.  Mabry v. Johnson, 467 U.S. 504, 508 n.3 (1984).  While under supervision, Petitioner remains in the custody of the State subject to having his post-release supervision revoked and being placed back into custody. Id.

The Union County, North Carolina, grand jury indicted Petitioner on July 7, 2014, for robbery with a dangerous weapon in violation of N.C. Gen. Stat. § 14-87 and possession of a firearm by a felon, in violation of N.C. Gen. Stat. § 14-415.1. [Doc. 1-1 at 919]. On August 8, 2016, the Union County grand jury indicted Petitioner on the additional charges of first-degree burglary in violation of N.C. Gen Stat. § 14-51, and two counts of second-degree kidnapping in violation of N.C. Gen. Stat. § 14-39. [Id.].

Petitioner proceeded to trial by jury. On September 26, 2016, the jury returned verdicts of guilty on the charges of robbery with a dangerous weapon and possession of a firearm by a felon. [Doc. 1 at 3]. The jury found Petitioner not guilty of the first-degree burglary charge and the two counts of second-degree kidnapping. [Doc. 1-1 at 923]. The trial court entered judgements on those verdicts and thereafter sentenced Petitioner to serve 84-113 months on the robbery charges and 17-30 months on the firearm charge. [Id.].

Petitioner gave oral notice of appeal on September 26, 2016. [Doc. 1 at 10]. The Court of Appeals affirmed on October 3, 2017, finding no error in the Petitioner's trial. No petition for discretionary review was filed with the North Carolina Supreme Court. [Id. at 149].

On August 15, 2019, Petitioner filed a Motion for Appropriate Relief ("MAR") in the Superior Court of Union County. [Doc. 1-1 at 148]. On July 1, 2020, the trial court ordered the State to respond to Petitioner's MAR. [Id. at 149]. Following the filing of the State's response, the trial court conducted a hearing and ultimately denied Petitioner's MAR by written order filed May 10, 2021. [Id. at 919-933]. Petitioner filed a petition for a writ of certiorari in the North Carolina Court of Appeals on December 6, 2021. [Id. at 934-965]. The appellate court denied the petition on April 8, 2022. [Id. at 966].

The Petitioner, through counsel, filed his Petition for Writ of Habeas Corpus in this Court on August 16, 2022. [Doc. 1]. The Petitioner seeks to challenge his state court judgments for the robbery and firearm convictions, alleging that his trial counsel was constitutionally ineffective. [Id. at 9-28].

On July 23, 2025, the Court entered an Order pursuant to Hill v. Braxton, 277 F.3d 701, 706 (4th Cir. 2002), giving Petitioner an opportunity to explain why his petition should not be dismissed as untimely. [Doc. 2]. To date, Petitioner has not responded to the Court's Order.

## II. FACTUAL BACKGROUND

The North Carolina Court of Appeals summarized the trial proceedings as follows:

> The State's evidence tended to show that in May of 2014, fifteen-year-old Ka.M. and her brother, twelve-year-old K.M. lived

3

with their mother and their aunt, Chelsa Wesley, in a house located on Aurora Boulevard in Stallings, North Carolina. Charmon Cureton, their mother's boyfriend, occasionally stayed overnight at the residence. A friend of Mr. Cureton, known as "Pumpkin," also used their garage to work on vehicles. The garage is located at the back of the house, and adjoining the kitchen.

On the night of 5 May 2014, K.M. and Ka.M. were alone at home, while their mother [Lakia Marrero] was out of town with Mr. Cureton and their aunt was at work. At approximately 8:00 p.m., Ka.M. heard an unexpected knock at the front door, but did not understand what the person had said. She told her brother, who went to the door. The men told K.M. they were looking for "Chelsie." K.M. opened the door and saw two strangers, later identified as [Petitioner] and Wesley Baker. [Petitioner] placed a handgun at K.M.'s side and forced his way into the house, followed by Mr. Baker. The two men brought K.M. and Ka.M. into the master bedroom, took their phones, and repeatedly demanded to know, "[W]here is the money at, where is the money[?]"

[Petitioner] waved his gun at the children and threatened to kill them, if they moved from the corner of the bedroom. After ransacking the house, [Petitioner] and Mr. Baker entered and searched the master bedroom closet. As "they were digging out the closet," Ka.M. observed the two men held "something plastic in their hand." At some point, Mr. Baker obtained a shotgun.

When lights from police vehicles appeared outside the residence, [Petitioner] and Mr. Baker panicked and ran through the house emptying plastic bags and other items from their pockets. They returned to the bedroom no longer carrying guns. Mr. Baker gave Ka.M. her phone and stayed in the bedroom with the children. [Petitioner] ran into the bathroom and tried to escape by breaking out a window. Police saw [Petitioner] climbing out of the window and shouted at him. [Petitioner] ran back through the house and into the garage before hiding in the attic.

4

Mr. Baker left the bedroom briefly and returned asking where [Petitioner] had gone. After checking the house again, Mr. Baker came outside through the front door with K.M., claiming they were the victims of the home invasion. K.M. revealed the truth once he was separated from Mr. Baker. He told the officers that his sister was still inside the house, as was the second intruder, whom K.M. believed to be in the attic. Ka.M. contacted her aunt by text message and eventually escaped the house by jumping from the bathroom window into the arms of a deputy sheriff.

After deploying chemical agents into the attic and master bedroom, members of the Union County Sheriff's Office's Special Response Team entered the house and located [Petitioner] hiding under a pile of insulation in the attic. He was taken into custody without incident.

Officers began searching the house, found a shotgun in the living room, and two semiautomatic handguns, a Ruger and a Beretta, in the bedroom adjacent to the kitchen. Several hundred dollars of United States currency was "kind of thrown on the floor at the entrance" of the "middle front bedroom." In the garage, officers found additional loose currency and a roll of $1,100 in cash wrapped in plastic. Another plastic bag was found on the floor in the master bedroom.

State v. Clyburn, No. 17-258, 2017 WL 4365146, at *1-2 (N.C. Ct. App. Oct. 3, 2017) [Doc. 1-1 at pp 112-14]. Petitioner testified in his own defense during trial. The appellate court summarized his evidence as follows:

[Petitioner] testified that he drove to the Aurora Boulevard residence on the afternoon of 5 May 2014, so that Pumpkin could install brakes on [his] car. After fixing [Petitioner's] brakes, Pumpkin agreed to perform additional repairs for [Petitioner] and Mr. Baker later in the day.

At approximately 6:00 p.m., Pumpkin met [Petitioner] and Mr. Baker at Mr. Baker's house in order to install a windshield in

5

Mr. Baker's car. Pumpkin drove [Petitioner] and Mr. Baker back to Aurora Boulevard, saying that "he needed to get something from the house and he had to get his tools." On the way to the residence, Pumpkin called K.M. to let him know they were coming. When they arrived, Pumpkin asked [Petitioner] to go into the house and retrieve a coffee can full of money from the master bedroom closet. Although the money belonged to him, Pumpkin explained he did not want to go into the house, because he would be "stuck" babysitting K.M. and Ka.M. Pumpkin said he would tell K.M. that [Petitioner] was coming for the coffee can and asked Mr. Baker to accompany [Petitioner] to ensure he did not take anything else from the house.

[Petitioner], who was unarmed, knocked at the front door and was greeted by K.M. After they discussed basketball, [Petitioner] told K.M. that Pumpkin had asked him to get the coffee can. K.M. invited [Petitioner] inside and directed him to his mother's bedroom.

When [Petitioner] offered to let him retrieve the coffee can from the closet, K.M. replied, "[N]o, you can go ahead and get it." [Petitioner] said hello to Ka.M., who was in her room talking on the phone, before entering the master bedroom and obtaining the coffee can from a shelf in the closet. He saw money inside the can but stated he did not remove it. [Petitioner] also saw a shotgun in the closet, but claimed he did not touch it.

As [Petitioner] was leaving the bedroom, Mr. Baker said he was "going to get something else" and picked up the shotgun. [Petitioner] confronted Mr. Baker and argued with him. When Mr. Baker continued "rummaging through the house," [Petitioner] decided to leave without him. He opened the front door, and saw "police everywhere" with their guns drawn. Noting Pumpkin's car was gone, [Petitioner] closed the door and dropped the coffee can. He went into the garage and looked out of the window to confirm that Pumpkin's car was no longer in the driveway.

When [Petitioner] returned to the bedroom, Mr. Baker cocked the shotgun and accused [Petitioner] of "set[ting] him up." [Petitioner] tried to climb out of the bedroom window, but saw

6

additional police located outside. He then told Mr. Baker to flee through the back door while he went out the front door. After Mr. Baker moved to the back of the house, however, [Petitioner] pulled down the attic door in the hallway ceiling and hid in the attic. He remained in the attic "for several hours," because he was afraid of the police and Mr. Baker.

Massi Omar Olin testified he had mistakenly left his Ruger nine-millimeter handgun at Chelsa Wesley's house while smoking marijuana with her in early 2014. He called Ms. Wesley about recovering his gun but "just never got a chance to get back down there to get it." She later told Mr. Olin "that the police ran in the house and the gun was gone[.]"

Id. at *2; [Doc. 1-1 at pp 114-16].

## III. DISCUSSION

In reviewing a § 2254 petition, the Court is guided by Rule 4 of the Rules Governing Section 2254 Cases, which directs the district court to dismiss a petition when it plainly appears from the petition and any exhibits that the petitioner is entitled to no relief. Rule 4, 28 U.S.C.A. foll. § 2254. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner's ability to attack his state court criminal judgment is subject to a one-year statute of limitations.[2] Specifically, the petition must be filed within one year of the latest of:

---

[2] In conducting its review under Rule 4, the Court "has the power to raise affirmative defenses sua sponte," including a statute of limitations defense under AEDPA. Hill v. Braxton, 277 F.3d 701, 706 (4th Cir. 2002).

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id. The limitations period is tolled during the pendency of a properly filed state post-conviction action. Id. § 2244(d)(2).

As this Court noted previously [Doc. 2], Petitioner's petition was not filed within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Id. § 2244(d)(1)(A). Moreover, despite being given an opportunity to do so, Petitioner has not demonstrated that his Petition is timely under § 2244(d)(1)(B), (C), or (D), nor has he shown that he is entitled to equitable tolling. Instead, Petitioner seeks federal habeas review by this Court through the "actual innocence" gateway under Schlup v. Delo, 513 U.S. 298 (1995).

8

In Schlup, the Supreme Court "recognized a limited 'actual innocence' exception to certain procedural bars to habeas review." Wolfe v. Dotson, 144 F.3d 218, 233 (4th Cir. 2025) (citation and quotation marks omitted). "[A] showing of actual innocence can serve as a 'gateway,' that is, such a showing may be utilized by a § 2254 petitioner to secure the adjudication of his otherwise defaulted constitutional claims." Id. (citation omitted). In McQuiggin v. Perkins, 569 U.S. 383 (2013), the Supreme Court expanded the Schlup actual innocence exception to claims which would otherwise be time barred under § 2244(d)(1)(D). Id. at 386.

To pass through this gateway, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. If the petitioner meets this burden, the Court must then consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," and determine whether the petitioner has met the standard for a gateway claim of actual innocence. House v. Bell, 547 U.S. 518, 538 (2006) (quoting Schlup, 513 U.S. at 327-28) (internal quotation marks omitted). In so doing, the Court must determine "whether it is more likely than not that no reasonable juror would have found

9

petitioner guilty beyond a reasonable doubt." Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010) (quoting Schlup, 513 U.S. at 327-28). In making this determination, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." Wolfe, 2025 WL 1859732, at *12.

Here, Petitioner asserts "that new reliable evidence—in particular the testimony and admissions of his trial counsel—not presented at trial" constitute the evidence of his actual innocence. [Doc. 1 at 29]. As the "new reliable evidence of his innocence," Petitioner ostensibly asserts that his trial counsel committed malpractice by not objecting to the State's admission and use of its Exhibit 20 at trial. [Id.].

The State's Exhibit 20 was an audio and video recording made by the "dash cam" located inside Sergeant Malcom Murray's patrol vehicle. [Doc. 1-1 at 495]. The dash cam purportedly recorded audio and video of Sgt. Murray speaking with Chelsa Wesley, the aunt of the two juveniles at the Aurora Boulevard home the evening of May 5, 2014. [Doc. 1-1 at 492, 494]. Further, the dash cam purportedly recorded Ms. Wesley speaking on her cell phone with Lakia Marrero, the mother of the two juveniles, as well as Sgt. Murray (using Ms. Wesley's cell phone) speaking with Charmon Cureton.

10

The gravamen of Petitioner's complaint surrounding the admission of State's Exhibit 20 is that it bolstered the two juveniles' trial testimony in violation of the Sixth Amendment's Confrontation Clause. [Doc. 1 at 16]. According to Petitioner, "Ms. Wesley's and Ms. Marrero's out-of-court statements helped the State establish that as far as the residents of the home knew, the residence contained two (2) firearms: a pistol and a shotgun. Since officers located three (3) firearms, including two (2) handguns, when they searched the residence after Petitioner's arrest, the out-of-court statements supported the State's theory that Petitioner brought one of the two handguns into the residence." [Id. at 18].

During the MAR hearing, Petitioner's trial counsel candidly admitted that he did not object to the admission into evidence of State's Exhibit 20. [Doc. 1-1 at 874]. Not only is counsel's testimony at the MAR hearing no evidence whatsoever of Petitioner's actual innocence, his testimony demonstrated a sound reason for allowing the admission of Exhibit 20. When asked to explain his theory of Petitioner's defense, counsel testified to the following:

> So you heard the evidence earlier. Basically, a summary of the evidence. And what it boiled down to were two things. There was Mr. Clyburn's version of events and there was the kids' version of events. Those were really the only two witnesses that -- that were there to testify as to the crimes that were alleged. So the key was to get the jury to question their credibility and at a

11

> minimum at least believe that Mr. Clyburn's testimony was a possibility, and that way it would raise reasonable doubt. So that was the main strategy, the best I remember.

[Doc. 1-1 at 871-72].

As counsel explained at the hearing, the competing testimony elicited at Petitioner's trial presented mutually exclusive scenarios. Either Petitioner came to the Aurora Boulevard home unarmed, engaged the juvenile male at the front door with cordial conversation, and then was invited into the home by the boy, or Petitioner arrived at the home armed and intent upon robbery, forced his way through the cracked doorway when the boy opened it, and stuck a pistol in the boy's ribs while asking him "where's the money." There was no way to reconcile Petitioner's version of events with the version of events explained through the testimony of the two juveniles at home the evening of May 5, 2014. Accordingly, counsel's efforts were aimed at discrediting the State's witnesses to create reasonable doubt. Counsel, as a matter of strategy, believed State's Exhibit 20 furthered Petitioner's interests:

> Yes. So, again, part of the strategy was to raise questions about the kids' testimony and also potentially support -- have them believe Mr. Clyburn's testimony, or at least believe it was a possibility.
>
> So there were a few things in the video that I had thought were helpful to our defense. Thing one at the very beginning there was some conversation between Sergeant Murray and the

kids about mom's gun. Now, earlier at least one of the kids, when they testified, they testified that -- that at least at the time they weren't aware of there being any guns in the house. But the beginning of that video, that conversation about mom's guns, sort of raised a question about that. So that was one thing.

Then throughout much of the video you could see and hear a phone conversation between Chelsa and -- and the kids' mother. I believe Lakia was her name. And what you could see, there was some frustration on there and they were -- you could overhear them talking about guns and whether there were guns in the house or not. And you could tell that there was sort of different version of events between what Chelsa was telling the police and what – and what Lakia and Charmon Cureton wanted the police to know. So I thought that was good because it looked like they were sort of trying to concoct a story.

Then, you know, as the -- as the phone conversation went on, Sergeant Murray got on the phone. He was talking to Charmon Cureton. The kids had testified earlier that Charmon Cureton did not live there in the house. That was -- and then when Sergeant Murray was talking with him on the phone, Mr. Cureton told him that he did live in the house. So that conflicted with the kids' testimony. So I thought that was helpful. Mr. Cureton denied there being any guns in the house, which was conflicting with what Chelsa was saying. So, again, it was showing that they were sort of having trouble getting their stories straight.

And then when Sergeant Murray got off the phone with Charmon Cureton, I remember him telling Chelsa, it was like something along the lines of, I don't believe him, or I think he's lying, something like that. And which I thought was favorable that we have these different stories.

Basically, you know, what it came down to, the defense, when you look at Mr. Clyburn's version of events, the defense theory was that he basically went there to -- went into the house to do a favor for this guy Pumpkin, and that was to get the money. And then the theory was that perhaps when this happened and

13

> the kids were on the phone with Chelsa, Chelsa wanted to protect that money and so called the police. And then the police showed up at the house. And once -- once they showed up, Mr. Clyburn and the co-defendant panicked and that's why Mr. Clyburn ended up in the attic.
>
> And then -- but once that happened on the other end, Mr. Cureton and Lakia Marrero, they also panicked because there were drugs and guns in the house. And they weren't -- they were trying to come up with reasons to cover their tracks because, obviously, drugs and guns and – can be -- both can be crimes, and together they can certainly be a crime. So that was mainly the theory there, that they were just trying -- initially Chelsa was just trying to protect the money, but then they had to come up with a story that wasn't really jiving. And this video sort of caught them sort of working on that story.

[Doc. 1-1 at 874-76].

Petitioner's actual innocence claim, asserted in the way that he has in his petition, fails to allege circumstances sufficient to open the gateway for consideration of his otherwise time-barred claim. Petitioner has presented nothing "new" as contemplated by Schlup. And trial counsel's MAR testimony and admissions concerning the State's Exhibit 20, while entirely reasonable and consistent with the theory of defense, were not in the nature of any "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." In Schlup the defendant presented video evidence, unavailable at trial, showing that the defendant could not have been present at the scene of the crime. The proffer by the present Defendant is nothing of the sort. Most importantly, however, Petitioner has articulated

14

no innocence theory anywhere in his petition, let alone marshaled the requisite evidence in support of one. Petitioner offers a list of witnesses he contends his trial attorney should have interviewed, along with a list of documents his trial attorney should have subpoenaed, but this presents only conjecture as to what new evidence *might* have been found. Ultimately, Petitioner complains that his trial attorney should have objected to State's Exhibit 20 being admitted into evidence. [Doc. 1 at 16-30]. As such, Petitioner asserts something in the nature of ineffective assistance of counsel, but what is more accurately characterized as a reasonable tactical decision by trial counsel. Such is not an actual innocence claim.

When considering the universe of facts presented at trial, together with the additional evidence Petitioner contends demonstrates his innocence, this habeas Court must focus upon the likely behavior of what the trier of fact would do with all such evidence. Accordingly, this habeas Court believes it more likely than not that any juror, acting reasonably, would have found Petitioner guilty beyond a reasonable doubt. Therefore, Petitioner does not pass through the gateway as prescribed in Schlup, and the Petition must be dismissed as untimely.

## IV. CONCLUSION

For the reasons stated herein, the Petitioner is entitled to no relief. The Notwithstanding his claim of actual innocence, Petitioner has failed to proffer any relevant evidence to show that his alleged ineffectiveness of counsel claim probably resulted in his conviction. The § 2254 petition shall be dismissed as having been filed outside of the applicable limitations period prescribed by 28 U.S.C. § 2244(d)(1).

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (noting that, in order to satisfy § 2253(c), a prisoner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that, when relief is denied on procedural grounds, a prisoner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

# **O R D E R**

**IT IS, THEREFORE, ORDERED** that:

1. The Petition for Writ of Habeas Corpus [Doc. 1] is **DISMISSED.**

2. Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: September 1, 2025

Martin Reidinger
Chief United States District Judge

17

Case 3:22-cv-00408-MR   Document 3   Filed 09/02/25   Page 17 of 17